FILED

2018 MAR 21  PM 3: 31

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2017 Grand Jury

UNITED STATES OF AMERICA,

            Plaintiff,

            v.

TIFFANY ROGERS,

            Defendant.

SA CR No. 18- 57-CJC

I N D I C T M E N T

[18 U.S.C. § 371: Conspiracy;
18 U.S.C. §§ 1341, 1346: Mail
Fraud Involving Deprivation of
Honest Services; 18 U.S.C.
§§ 1343, 1346: Wire Fraud
Involving Deprivation of Honest
Services; 18 U.S.C. § 1952(a)(3):
Use of an Interstate Facility in
Aid of Unlawful Activity; 18
U.S.C. § 2: Aiding and Abetting
and Causing an Act to be Done; 18
U.S.C. §§ 981(a)(1)(C) and 28
U.S.C. § 2461(c): Criminal
Forfeiture]

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 371]

A.   INTRODUCTORY ALLEGATIONS

     At all times relevant to this Indictment:

     1.   Healthsmart Pacific Inc., doing business as Pacific
Hospital of Long Beach ("Pacific Hospital"), was a hospital located
in Long Beach, California, specializing in surgeries, particularly

spinal and orthopedic surgeries.  From at least in or around 1997 to October 2013, Pacific Hospital was owned and/or operated by Michael D. Drobot ("Drobot").  Along with Drobot, unindicted co-conspirator ("UCC") A owned and/or operated Pacific Hospital from in or around 2005 to in or around October 2010.

2.    Defendant TIFFANY ROGERS ("defendant ROGERS") was an orthopedic surgeon who practiced medicine with a medical group located in Torrance, California, specializing in orthopedic spinal surgery.

3.    UCC-B "marketed" and provided implantable medical devices, hardware, and instrumentation for spinal surgeries ("spinal hardware") to defendant ROGERS.  Based on his relationship with Paul Randall ("Randall") -- a "marketer" who did business with Pacific Hospital and various other entities and individuals -- UCC-B facilitated defendant ROGERS' relationship with Pacific Hospital.

4.    International Implants LLC ("I2") was a limited liability company, controlled by Drobot and headquartered in Newport Beach, California, that purchased surgical devices, hardware, and instrumentation from original manufacturers and sold them to hospitals, particularly Pacific Hospital.

5.    Pacific Specialty Physician Management, Inc. ("PSPM") was a corporation, owned and controlled by Drobot and others and headquartered in Newport Beach, California, that provided administrative and management services for physicians' offices.

6.    James Canedo ("Canedo") was Pacific Hospital's Chief Financial Officer ("CFO").  UCC-C was Pacific Hospital's controller, who would issue payment to vendors and other payees at the direction of Drobot, Canedo, and others.

2

California Workers' Compensation System ("CWCS")

7.    The California Workers' Compensation System ("CWCS") was a system created by California law to provide insurance covering treatment of injury or illness suffered by individuals in the course of their employment.  Under the CWCS, employers were required to purchase workers' compensation insurance policies from insurance carriers to cover their employees.  When an employee suffered a covered injury or illness and received medical services, the medical service provider submitted a claim for payment to the relevant insurance carrier, which then paid the claim.  Claims were submitted to and paid by insurance carriers either by mail or electronically. The CWCS was governed by various California laws and regulations.

8.    The California State Compensation Insurance Fund ("SCIF") was a non-profit insurance carrier, created by the California Legislature, that provided workers' compensation insurance to employees in California, including serving as the "insurer of last resort" under the CWCS system for employers without any other coverage.

Health Care Programs

9.    SCIF and other workers' compensation insurance carriers, personal injury insurers, and other public and private plans and contracts, were "health care benefit programs" (as defined in 18 U.S.C. § 24(b)), that affected commerce.

Relevant California Laws Pertaining to Bribery and Kickbacks

10.   California law, including the California Business and Professions Code and the California Insurance Code, prohibited the offering, delivering, soliciting, or receiving of anything of value in return for referring a patient for medical services.

3

11.   California Business & Professions Code Section 650 prohibited the offer, delivery, receipt, or acceptance by certain licensees -- specifically including physicians -- of any commission or other consideration, whether in the form of money or otherwise, as compensation or inducement for referring patients, clients, or customers to any person.

12.   California Insurance Code Section 750(a) prohibited anyone who engaged in the practice of processing, presenting, or negotiating claims -- including claims under policies of insurance -- from offering, delivering, receiving, or accepting any commission or other consideration, whether in the form of money or otherwise, as compensation or inducement to any person for the referral or procurement of clients, cases, patients, or customers.

<u>Fiduciary Duties and the Physician-Patient Relationship</u>

13.   A "fiduciary" obligation generally existed whenever one person -- a client -- placed special trust and confidence in another -- the fiduciary -- in reliance that the fiduciary would exercise his or her discretion and expertise with the utmost honesty and forthrightness in the interests of the client, such that the client could relax the care and vigilance she or he would ordinarily exercise, and the fiduciary knowingly accepted that special trust and confidence and thereafter undertook to act on behalf of the client based on such reliance.

14.   Physicians owed a fiduciary duty to their patients, requiring physicians to act in the best interest of their patients, and not for their own professional, pecuniary, or personal gain. Physicians owed a duty of honest services to their patients for decisions made relating to the medical care of those patients,

4

1   including the informed choice of whether to undergo surgery and other
2   medical procedures, as well as the selection of a provider and
3   facility for such surgeries and procedures.  Patients' right to
4   honest services from physicians included the right not to have
5   physician-fiduciaries solicit or accept bribes and kickbacks
6   connected to the medical care of such patients.

7   B.   OBJECTS OF THE CONSPIRACY

8        15.  Beginning on an unknown date, but no later than in or about
9   June 2012, and continuing through at least in or around April 2013,
10  in Orange and Los Angeles Counties, within the Central District of
11  California, and elsewhere, Drobot, defendant ROGERS, Canedo, UCC-B,
12  UCC-C, and others known and unknown to the Grand Jury at various
13  times, knowingly combined, conspired, and agreed to commit the
14  following offenses against the United States: Honest services mail
15  fraud, in violation of Title 18, United States Code, Sections 1341
16  and 1346; Honest services wire fraud, in violation of Title 18,
17  United States Code, Sections 1343 and 1346; and Use of an interstate
18  facility in aid of bribery, in violation of Title 18, United States
19  Code, Section 1952(a).

20  C.   MANNER AND MEANS OF THE CONSPIRACY

21       16.  The objects of the conspiracy were to be carried out, and
22  were carried out, in the following ways, among others:

23            a.   Drobot, Canedo, Randall, and other co-conspirators
24  working with Pacific Hospital would offer to pay and cause the
25  payment of kickbacks to defendant ROGERS and other surgeons (the
26  "Pacific Induced Surgeons"), chiropractors, personal injury
27  attorneys, marketers, and others (collectively, the "Pacific Kickback
28  Recipients") in exchange for patient-related referrals to Pacific

5

1  Hospital for spinal surgeries, other types of surgeries, magnetic
2  resonance imaging ("MRI"), toxicology, durable medical equipment, and
3  other services (the "Kickback Tainted Surgeries and Services") that
4  would be billed to health care benefit programs or subject to
5  personal injury claims and/or liens.

6      b.   Influenced by the promise of kickbacks, Pacific
7  Kickback Recipients, including defendant ROGERS, would cause patients
8  insured by various health care benefit programs, or subject to
9  personal injury claims and/or liens, to have Kickback Tainted
10  Surgeries and Services at Pacific Hospital.

11      c.   Pacific Hospital and Pacific Induced Surgeons,
12  including defendant ROGERS, would submit claims, by mail and
13  electronically, to health care benefit programs and/or personal
14  injury attorneys (collectively, "Potential Claim Payers") for
15  payments related to the Kickback Tainted Surgeries and Services.

16      d.   As Drobot, defendant ROGERS, Canedo, and other co-
17  conspirators knew and intended, and as was reasonably foreseeable to
18  them, in using the mails, wire communications, and facilities in
19  interstate commerce to: (i) communicate about patient referrals and
20  underlying kickback arrangements, (ii) submit claims to Potential
21  Claim Payers for the Kickback Tainted Surgeries and Services, and
22  (iii) obtain payment from Potential Claim Payers for the Kickback
23  Tainted Surgeries and Services, Drobot, defendant ROGERS, Canedo, and
24  other co-conspirators would solicit, offer, receive, or pay, and/or
25  cause the solicitation, offering, receipt, and payment of kickbacks
26  that were material to patients and Potential Claim Payers.

27      e.   In soliciting and receiving concealed bribes and
28  kickbacks to induce the referral of patients and corresponding

6

1  ancillary services to Pacific Hospital, defendant ROGERS and other
2  medical professionals would deprive patients of their right to honest
3  services.

4          f.   Using the mails and other facilities in interstate
5  commerce, Drobot, Canedo, and others would communicate about and pay,
6  and cause the payment of, kickbacks and bribes to Pacific Kickback
7  Recipients, including defendant ROGERS, who caused the referral of,
8  and/or performed, Kickback Tainted Surgeries and Services at Pacific
9  Hospital.

10         g.   Potential Claim Payers would pay Pacific Hospital and
11  Pacific Induced Surgeons, including defendant ROGERS, for the
12  Kickback Tainted Surgeries and Services by mail and electronically.

13         h.   To conceal and disguise the kickback payments from
14  Potential Claim Payers, patients, and law enforcement, Drobot,
15  Canedo, and other co-conspirators, through Pacific Hospital, would
16  enter into arrangements with Pacific Kickback Recipients, including
17  defendant ROGERS.  In many cases, these arrangements would be reduced
18  to written contracts, including, among others, lease and rental
19  agreements, option agreements, collection agreements, management
20  agreements, marketing agreements, and pharmacy agreements.

21         i.   The written contracts would not specify that one
22  purpose for the agreements would be to induce Pacific Kickback
23  Recipients to refer Kickback Tainted Surgeries and Services to
24  Pacific Hospital.  Additionally, the value or consideration discussed
25  as part of these arrangements would, in fact, generally not be
26  provided or desired; rather, the compensation would be paid, entirely
27  or in part, depending on the arrangement, to cause Pacific Kickback
28  Recipients to refer Kickback Tainted Surgeries and Services to

1   Pacific Hospital.  Relatedly, the written contracts would generally
2   allow for remuneration to Pacific Kickback Recipients far in excess
3   of any reasonable fair market value assessment of legitimate services
4   or things of value purportedly contracted for -- to the extent
5   calculated without regard to the value of the Kickback Tainted
6   Surgeries and Services.

7           j.   Defendant ROGERS would receive remuneration in
8   exchange for performing Kickback Tainted Surgeries and Services at
9   Pacific Hospital.  The illegal kickback and bribe payments would be
10  provided to defendant ROGERS under the guise of a bogus "Outsourced
11  Collection Agreement."

12          k.   Drobot, Canedo, and others would maintain, review,
13  and/or communicate about records of the number of Kickback Tainted
14  Surgeries and Services performed at Pacific Hospital due to referrals
15  from defendant ROGERS and other Pacific Kickback Recipients, as well
16  as the amounts owed and paid to defendant ROGERS and other Pacific
17  Kickback Recipients for such referrals.

18  D.   EFFECTS OF THE CONSPIRACY

19       17.  Had Potential Claim Payers and patients known the true
20  facts regarding the payment of kickbacks and bribes for the referral
21  of Kickback Tainted Surgeries and Services performed at Pacific
22  Hospital: (a) the Potential Claim Payers would have subjected the
23  claims to additional review, would not have paid the claims, and/or
24  would have paid a lesser amount on the claims; and (b) patients would
25  have more closely scrutinized a surgery or hospital service
26  recommendation, would have sought second opinions from physicians who
27  did not have a financial conflict of interest, would not have had the

28

1  surgery or service performed, and/or would have insisted on a

2  different hospital facility.

3      18.    Between in or about October 2012 and April 2013,

4  defendant ROGERS referred and/or performed Kickback Tainted Surgeries

5  and Services at Pacific Hospital.  In connection with these Kickback

6  Tainted Surgeries and Services, Pacific Hospital billed Potential

7  Claim Payers approximately $1.5 million, and was paid approximately

8  $550,000.  Drobot, Canedo, and UCC-C, through Pacific Hospital, paid

9  and caused to be paid to defendant ROGERS at least approximately

10 $35,000 in connection with her Kickback Tainted Surgeries and

11 Services.

12 E.   OVERT ACTS

13     19.  On or about the following dates, in furtherance of the

14 conspiracy and to accomplish the objects of the conspiracy, Drobot,

15 defendant ROGERS, Canedo, UCC-A, UCC-B, UCC-C, and other co-

16 conspirators known and unknown to the Grand Jury, committed,

17 willfully caused others to commit, and aided and abetted the

18 commission of the following overt acts, among others, within the

19 Central District of California and elsewhere:

20     Overt Act No. 1:   On or about June 21, 2012, Drobot, defendant

21 ROGERS, Randall, UCC-B, and another individual met to discuss

22 potential financial arrangements to induce defendant ROGERS to

23 perform Kickback Tainted Surgeries and Services at Pacific Hospital.

24     Overt Act No. 2:   On or about July 14, 2012, defendant ROGERS

25 emailed Drobot referencing their June 21, 2012 meeting and wrote, in

26 part:

27     I would like to find a time where we can get together to

28     continue discussions.  I will give my hospital privilege packet

9

1    to [individual connected to Pacific Hospital] shortly.

2    Hopefully the process can be expedited.

3    Overt Act No. 3:    As part of the same email chain identified

4    in the preceding Overt Act, on or about July 26, 2012, Drobot and

5    defendant ROGERS confirmed a dinner meeting for Sunday, July 29,

6    2012, at Fleming's Steakhouse.

7    Overt Act No. 4:    On or about July 30, 2012, a Pacific

8    Hospital paralegal emailed defendant ROGERS, writing that "[Drobot]

9    requested that I send you the attached agreement.   Please execute two

10   copies and return them to me for [Drobot's] counter[-]signature."

11   Overt Act No. 5:    As part of the same email chain identified

12   in the preceding Overt Act, on or about September 6, 2012, defendant

13   ROGERS emailed the Pacific Hospital paralegal writing: "Did you have

14   the agreement?"

15   Overt Act No. 6:    As part of the same email chain identified

16   in the preceding Overt Act, on or about September 7, 2012, the

17   Pacific Hospital paralegal responded that he had mailed a copy to

18   defendant ROGERS and asked if she received the signed agreement.

19   Defendant ROGERS responded: "Yes, but I signed it & sent it back for

20   signature, I believe."

21   Overt Act No. 7:    As part of the same email chain identified

22   in the preceding Overt Act, on or about September 9, 2012, the

23   Pacific Hospital paralegal responded to defendant ROGERS that the

24   signed contract may have been lost in the mail and requested

25   defendant ROGERS mailing address to re-send the agreement.

26   Overt Act No. 8:    As part of the same email chain identified

27   in the preceding Overt Act, on or about September 12, 2012, the

28

1  Pacific Hospital paralegal emailed defendant ROGERS a fully executed
2  copy of an "Outsourced Collection Agreement."

3      Overt Act No. 9:     On an unknown date, defendant ROGERS,
4  individually, and Drobot, through Pacific Hospital, entered into an
5  "Outsourced Collection Agreement," purportedly "effective July 1,
6  2012," wherein defendant ROGERS contracted to assist Pacific Hospital
7  in collecting certain personal injury and workers' compensation
8  claims and liens that Pacific Hospital would purportedly refer to
9  defendant ROGERS to collect on behalf of the hospital.  Under the
10 agreement, Pacific Hospital agreed to pay defendant ROGERS 15% of the
11 amount collected and received by Pacific Hospital on referred claims.

12     Overt Act No. 10:     On or about September 18, 2012, an un-
13 indicted co-conspirator ("UCC") affiliated with Pacific Hospital
14 emailed another Pacific Hospital employee, with a subject "Dr.
15 Tiffany Rogers' cases," and discussed having "just received two spine
16 fusion cases from our new surgeon's office."

17     Overt Act No. 11:     On or about October 1, 2012, defendant
18 ROGERS performed a spinal surgery on patient M.B. at Pacific
19 Hospital.

20     Overt Act No. 12:     On or about October 8, 2012, defendant
21 ROGERS performed a spinal surgery on patient M.M. at Pacific
22 Hospital.

23     Overt Act No. 13:     On or about October 20, 2012, defendant
24 ROGERS performed a spinal surgery on patient M.A. at Pacific
25 Hospital.

26     Overt Act No. 14:     On or about November 19, 2012, defendant
27 ROGERS performed a spinal surgery on patient C.C. at Pacific
28 Hospital.

1    Overt Act No. 15:    On or about December 8, 2012, defendant
2    ROGERS performed a spinal surgery on patients F.C. and C.H. at
3    Pacific Hospital.

4    Overt Act No. 16:    On or about December 17, 2012, defendant
5    ROGERS performed a spinal surgery on patients M.S. and S.C. at
6    Pacific Hospital.

7    Overt Act No. 17:    On or about March 12, 2013, defendant ROGERS
8    emailed Drobot, writing, in part: "I am checking to see what the
9    update with the collection agreement is.   To date, I have done 8
10   cases since Oct 1[.]"

11   Overt Act No. 18:    As part of the same email chain identified
12   in the preceding Overt Act, on or about March 25, 2013, defendant
13   ROGERS emailed Drobot, writing:

14       It's Monday, I'm here at Pacific doing two more spine cases.   I
15       have two more scheduled for next week.   As mentioned prior, I
16       have been doing cases since October.   I still have had no
17       contact regarding the collections agreement.

18   Overt Act No. 19:    On or about March 25, 2013, defendant ROGERS
19   performed a spinal surgery on patients Ro.C. and Ra.C at Pacific
20   Hospital.

21   Overt Act No. 20:    On or about March 28, 2013, Canedo emailed
22   UCC-C, copying defendant ROGERS, instructing UCC-C to "cut a check to
23   Tiffany Rogers, MD, for $35,478.21[,]" and requested defendant ROGERS
24   to provide an invoice supporting the payment.

25   Overt Act No. 21:    As part of the same email chain identified
26   in the preceding Overt Act, on or about March 28, 2013, defendant
27   ROGERS emailed Canedo inquiring if she still needed to send the
28   requested invoice.   Canedo responded:

1       You should send me an invoice with those accounts on it to show

2       that you actually collected those accounts.  That's what your

3       agreement covers.

4   Defendant ROGERS replied:

5       Ok.  I will work on it.  Can you let me know what accounts the

6       35K is for?  Also, please re-send the invoice template.

7       <u>Overt Act No. 22:</u>   As part of the email chain identified in the

8   preceding Overt Act, on or about March 28, 2013, Canedo responded to

9   defendant ROGERS with a list identifying various patients on whom

10  defendant ROGERS performed surgery at Pacific Hospital in October and

11  December 2012, with collections to date corresponding to those

12  patients totaling $236,521.40.  The spreadsheet also identified that

13  fifteen percent of those collections was $35,478.21.

14      <u>Overt Act No. 23:</u>   On or about March 28, 2013, Pacific Hospital

15  issued a check (#270300) for $35,478.21 to defendant ROGERS.

16      <u>Overt Act No. 24:</u>   On or about April 2, 2013, Pacific Hospital

17  mailed a claim for the hospital-billing component of patient Ro.C.'s

18  medical care to Blue Shield of California.

19      <u>Overt Act No. 25:</u>   On or about April 4, 2013, defendant ROGERS

20  caused the check issued from Pacific Hospital, in the amount of

21  $35,478.21, to be deposited into her Bank of America checking account

22  ending in 7570 (the "7570 BoA Acct").

23

24

25

26

27

28

COUNTS TWO THROUGH FOUR

[18 U.S.C. §§ 1341, 1346, 2(b)]

20.   Paragraphs 1 through 14 and 16 through 19 of this Indictment, including all subparagraphs, are re-alleged and incorporated by reference as if fully set forth herein.

A.   THE SCHEME TO DEFRAUD

21.   Beginning on a date unknown, but from no later than in or around June 2012, and continuing through at least in or around July 2013, in Orange and Los Angeles Counties, within the Central District of California, and elsewhere, Drobot, defendant ROGERS, Canedo, UCC-B, UCC-C, and others known and unknown to the Grand Jury at various times, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud patients of their right to honest services of their physicians' performance of duties as treating physicians and medical providers by soliciting, offering, accepting, and paying bribes and kickbacks to induce the referral of Kickback Tainted Surgeries and Services to Pacific Hospital.

B.   OPERATION OF THE SCHEME TO DEFRAUD

22.   The fraudulent scheme operated, in substance, as set forth in paragraphs 16 through 19 of this Indictment.

C.   USE OF THE MAILS

23.   On or about the following dates, within the Central District of California, and elsewhere, Drobot, defendant ROGERS, and other co-schemers, for the purpose of executing the above-described scheme to defraud, willfully caused the following items to be placed in a post office and authorized depository for mail matter to be delivered by the Postal Service:

| COUNT | APPROXIMATE DATE | MAILING |
|---|---|---|
| TWO | 4/2/2013 | Claim for reimbursement from Pacific Hospital to ILWU in San Francisco, California, seeking $125,608.10 for the hospital-billing component of medical care provided to patient Ro.C., based on a spinal fusion surgery defendant ROGERS performed at Pacific Hospital on or about March 25, 2013. |
| THREE | 4/11/2013 | Claim for reimbursement from Pacific Hospital to Gallagher Basset in Tucson, Arizona and an attorney for patient T.E. in Sanford, California, seeking $99,326 for the hospital-billing component of medical care provided to patient T.E., based on a spinal cervical fusion surgery defendant ROGERS performed at Pacific Hospital on or about April 1, 2013. |
| FOUR | 6/27/2013 | Check (#0102485862) from Gallagher Basset, in the amount of $28,483.76, to Pacific Hospital for reimbursement of the claim related to the hospital-billing component for patient T.E., who defendant ROGERS performed spinal surgery on at Pacific Hospital on or about April 1, 2013. |

COUNTS FIVE THROUGH EIGHT

[18 U.S.C. §§ 1343, 1346]

24.   Paragraphs 1 through 14 and 16 through 19 of this Indictment, including all subparagraphs, are re-alleged and incorporated by reference as if fully set forth herein.

A.   THE SCHEME TO DEFRAUD

25.   Beginning on a date unknown, but from no later than June 2012, and continuing through at least in or around July 2013, in Orange and Los Angeles Counties, within the Central District of California, and elsewhere, Drobot, defendant ROGERS, Canedo, UCC-B, UCC-C, and others known and unknown to the Grand Jury at various times, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud patients of their right to honest services of their physicians' performance of duties as treating physicians and medical providers by soliciting, offering, accepting, and paying bribes and kickbacks to induce the referral of Kickback Tainted Surgeries and Services to Pacific Hospital.

B.   OPERATION OF THE SCHEME TO DEFRAUD

26.   The fraudulent scheme operated, in substance, as set forth in paragraphs 16 through 19 of this Indictment.

C.   USE OF INTERSTATE WIRES

27.   On or about the following dates, within the Central District of California, and elsewhere, Drobot, defendant ROGERS, and other co-schemers, for the purpose of executing the above-described scheme to defraud, transmitted and caused the transmission of items by means of wire communication in interstate commerce, as set forth below:

| COUNT | APPROXIMATE DATE | INTERSTATE WIRE TRANSMISSION |
|-------|------------------|------------------------------|
| FIVE | 3/26/2013 | Interstate wire through a Yahoo, Inc. server located outside of California, effectuating the transmission of an e-mail exchange involving defendant ROGERS, Drobot, and Canedo, which identified surgeries defendant ROGERS performed at Pacific Hospital in exchange for a kickback and bribe payment. |
| SIX | 4/1/2013 | Interstate wire through a Yahoo, Inc. server located outside of California, effectuating the transmission of an e-mail involving defendant ROGERS, Drobot, and Canedo discussing the kickback and bribe amounts defendant ROGERS should expect as a result of her Kickback Tainted Surgeries and Services performed at Pacific Hospital. |
| SEVEN | 4/4/2013 | Interstate wire outside of California, effectuating a transfer of $35,478.21 from Pacific Hospital's East West Bank account ending in 0545 in California to the 7570 BoA Acct, representing a kickback and bribe payment to defendant ROGERS for Kickback Tainted Surgeries and Services she performed at Pacific Hospital. |
| EIGHT | 7/3/2013 | Interstate wire outside of California, effectuating a transfer of $28,483.76 from Gallagher Basset to Pacific Hospital's East West Bank account ending in 0553 in California, reimbursing a claim related to the hospital bill for patient T.E., who defendant ROGERS performed spinal surgery on at Pacific Hospital on or about April 1, 2013. |

COUNTS NINE AND TEN

[18 U.S.C. § 1952(a)(3); 18 U.S.C. § 2]

28.  Paragraphs 1 through 14, 16 through 19, 23, and 27 of this Indictment, including all subparagraphs, are re-alleged and incorporated by reference as if fully set forth herein.

29.  On or about the dates set forth below, in Orange and Los Angeles Counties, within the Central District of California, and elsewhere, Drobot, defendant ROGERS, Canedo, UCC-C, and others, used, aided and abetted the use of, and willfully caused the use of, the mail and facilities in interstate commerce, with the intent to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, namely, kickbacks and bribes in violation of California Business & Professions Code Section 650 and California Insurance Code Section 750, and thereafter performed, attempted to perform, and aided and abetted and willfully caused the performance of an act to promote, manage, establish, and carry on, and to facilitate the promotion, management, establishment, and carrying on of such unlawful activity as follows:

///

///

///

| COUNT | DATE | USE OF MAIL OR FACILITY IN INTERSTATE COMMERCE | ACTS PERFORMED THEREAFTER |
|---|---|---|---|
| NINE | 3/28/2013 | E-mail exchange between defendant ROGERS, Canedo, and UCC-C, transmitted through a Yahoo, Inc. server located outside of California, discussing the Kickback Tainted Surgeries and Services supporting Pacific Hospital's payment of $35,478.21 to defendant ROGERS. | On or about April 4, 2013, defendant ROGERS caused a check in the amount of $35,478.21, representing a kickback and bribe payment for Kickback Tainted Surgeries and Services she performed at Pacific Hospital, to be deposited into her 7570 BoA Acct. |
| TEN | 4/2/2013 | Mailing of the claim/billing identified in Count Two above, seeking $125,608.10 in reimbursement from ILWU for the hospital-billing component of medical care provided to patient Ro.C., based on a spinal fusion surgery defendant ROGERS performed at Pacific Hospital on or about March 25, 2013. | On or about September 9, 2014, Drobot caused a check in the amount of $100,486.48 from ILWU-PMA Coastwise Claims Office, for the claim submitted on patient Ro.C., to be deposited in Pacific Hospital's Wells Fargo bank account ending in 5498. |

1                            FORFEITURE ALLEGATION

2                 [18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

3       30.  Pursuant to Rule 32.2(a), Fed. R. Crim. P., notice is

4 hereby given to defendant ROGERS ("defendant") that the United States

5 will seek forfeiture as part of any sentence in accordance with Title

6 18, United States Code, Section 981(a)(1)(C) and Title 28, United

7 States Code, Section 2461(c), in the event of defendant's conviction

8 under any of Counts One through Ten of this Indictment.

9       31.  Defendant shall forfeit to the United States the following

10 property:

11            a.   all right, title, and interest in any and all

12 property, real or personal, that constitutes or is derived, directly

13 or indirectly, from the proceeds traceable to the commission of any

14 offense set forth in any of Counts One through Ten of this

15 Indictment; and

16            b.   a sum of money equal to the total value of the

17 property described in subparagraph a.

18       32.  Pursuant to Title 21, United States Code, Section 853(p),

19 as incorporated by Title 28, United States Code, Section 2461(c),

20 defendant shall forfeit substitute property, up to the total value of

21 the property described in the preceding paragraph if, as a result of

22 any act or omission of defendant, the property described in the

23 preceding paragraph, or any portion thereof (a) cannot be located

24 upon the exercise of due diligence; (b) has been transferred, sold to

25 or deposited with a third party; (c) has been placed beyond the

26 ///

27 ///

28 ///

1   jurisdiction of the Court; (d) has been substantially diminished in

2   value; or (e) has been commingled with other property that cannot be

3   divided without difficulty.

4

5                                          A TRUE BILL

6

7                                          /S/
                                    _____
8                                          Foreperson

9

10  TRACY L. WILKISON
    Attorney for the United States,
11  Acting Under Authority Conferred
    by 28 U.S.C. § 515
12

13

14

15  LAWRENCE S. MIDDLETON
    Assistant United States Attorney
    Chief, Criminal Division
16

17  DENNISE D. WILLETT
    Assistant United States Attorney
    Chief, Santa Ana Branch Office
18

19  JOSEPH T. MCNALLY
    Assistant United States Attorney
    Deputy Chief, Santa Ana Branch Office
20

21  ASHWIN JANAKIRAM
    SCOTT D. TENLEY
22  Assistant United States Attorneys

23

24

25

26

27

28

                            21